UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MATTHEW MCDERMOTT,

                    Plaintiff,

            v.

KALITA MUKUL CREATIVE INC.,

                    Defendant.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM & ORDER**
23-CV-01274 (HG)

**HECTOR GONZALEZ**, United States District Judge:

Plaintiff Matthew McDermott brought this action for copyright infringement against Kalita Mukul Creative Inc. ("KMC").  After Defendant conceded liability, the Court entered summary judgment on that issue.  *See* Jan. 3, 2024, Minute Order.  On April 16, 2024, I presided over a bench trial limited to the issue of damages.  *See* Apr. 16, 2024, Minute Order.  The parties have submitted proposed findings of fact and conclusions of law, *see* ECF Nos. 46, 47 (Plaintiff's); ECF Nos. 51, 52 (Defendant's), and the Court now issues its own in accordance with Rule 52(a).  As explained below, the Court awards Plaintiff $940 in statutory damages.  The Court also denies Plaintiff's motion for fees and costs associated with prosecuting this action.

**FINDINGS OF FACT**[1]

**I.    Kalita and Mukul Found Defendant KMC**

Sanghamitra Mitra Kalita and her husband, Nitin Mukul, formed Defendant KMC in July 2020.  Tr. at 62:21–63:1.  Defendant was formed with the goal of assisting its founders'

---

[1]    The Court refers to the pages assigned by the Electronic Case Files system ("ECF"). These findings of fact are derived from the trial transcript ("Tr.") docketed at ECF No. 45, as well as exhibits entered into evidence at trial.  Except where otherwise indicated, where facts are recited, including as quotations from testimony, the Court finds the fact recited to be true.  To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.

community in Queens by providing it with resources during the COVID-19 pandemic. *Id.* at
62:9–18, 63:2–11. At the time it was started, the business was an email mailing list providing
information about COVID-19 resources, such as where community members could order masks.
*Id.* at 28:4–7, 62:21–63:11. As the operation grew, it became more formalized, with Ms. Kalita
and Mr. Mukul putting out a newsletter and hiring staff. *Id.* at 63:12–17. But it remained a
small business. By the end of 2021, Defendant had just four employees. *Id.* at 25:19–21.

Defendant is a for-profit publishing outlet. *Id.* at 24:9–13. It generates revenue through a
mix of advertising, sponsorship, and events. *Id.* at 24:21–22. It also receives philanthropic
grants and government contracts by which government agencies pay it to disseminate messages.
*Id.* at 24:23–25:2. In 2020, the founding year, Defendant brought in no revenue outside of
grants. *Id.* at 66:7–10. In 2021, Defendant generated $400,000 in revenue, just under around
half of which came from grants and donations. *Id.* at 67:8–12, 68:25–69:1. And in 2022,
Defendant generated $800,000 in revenue, again with around half from grants and donations. *Id.*
at 68:23–69:3.

In 2021, Defendant also began to garner revenue from advertising. *Id.* at 70:6–7. In
large media organizations, clients pay media companies to place their ads based on, for example,
the number of impressions that the ad receives. *Id.* at 69:10–12. But given Defendant's size—its
articles do not receive the thousands of impressions that larger platforms can generate—
advertisers turn to it not for volume but rather to reach certain demographic groups. *Id.* at
69:12–15, 70:9–13. For example, a nonprofit organization or film festival might place certain
job-opening ads with Defendant. *Id.* at 69:19–20. As such, it "[v]ery rarely" charges for ads
based on number of clicks and instead uses flat fees. *Id.* at 70:1–5. Regardless of the source of
revenue, Defendant sends "pretty much all" of it back into the business. *Id.* at 70:18–20. It is

nearly a break-even enterprise each year; at most, profits do not exceed tens of thousands of dollars. *Id.* at 70:20–71:4.

## II.    Plaintiff Takes and Defendant Uses the Photo

Plaintiff has worked as a freelance photographer and photojournalist for 23 years. *Id.* at 91:13–15, 91:21–22. He primarily works for the *New York Post*. *Id.* at 91:19–20. On Monday, December 13, 2021, Plaintiff received a job offer from the *Post* to take photos of New York City's new police commissioner. DX8 (Dec. 13, 2021, Email). He accepted it, went to the job the next day,[2] and did a photo shoot with the newly appointed police commissioner, Keechant Sewell. Tr. at 103:2–4, 106:4–7. Plaintiff took at least 59 photos of her. *Id.* at 106:9–21. One of those photos depicts Commissioner Sewell looking into the camera with the Manhattan Bridge in the background. *See* JX1 (the "Photo"). The photoshoot with Commissioner Sewell was part of one eight-hour shift with the *Post*, during which Plaintiff believes he also completed at least one additional job unrelated to the Photo. Tr. at 107:5–108:3. The *Post* paid him $470 for the entire shift. *Id.* at 107:18–19. After the shoot with Commissioner Sewell, Plaintiff sent all the photos he took to the *Post*. *Id.* at 106:22–23. In exchange, the *Post* had an indefinite license to use the Photo, as well as any others he took during his shift. *Id.* at 108:5–7, 111:6–8, 103:11–15. The Photo appeared in the *Post* the day after the shoot.[3] *Id.* at 94:11–15. No one else has approached Plaintiff about licensing the Photo. *Id.* at 113:23–25.

---

[2]     Although Plaintiff testified, and the parties agree, that Plaintiff took the photos of Commissioner Sewell on December 13, 2021, Tr. at 94:10; ECF No. 46 at 7 ¶ 2; ECF No. 51 ¶ 11, based on the timing of the job offer in the email, DX8, Plaintiff appears to have actually taken the photos on Tuesday, December 14, 2021. This detail is ultimately immaterial to this decision.

[3]     Again, although Plaintiff thought the Photo appeared in the *Post* on December 14, based on the timeline discussed above, it would have appeared on December 15. *See* Tr. at 94:11–12; *supra* note 2. Indeed, the December 15 date appears on the cover of the *Post* containing the Photo and admitted into evidence. *See* JX2.

At the time the Photo was taken, Defendant was publishing three to five written pieces per week. *Id.* at 32:22–25. New Yorkers had just elected Eric Adams as mayor, and Defendant wanted to highlight new appointees in the Adams administration, with an emphasis on the diversity in City government and, in particular, the appointment of the City's first female police commissioner, Ms. Sewell. *Id.* at 78:10–21, 79:12–14. So later in December, Defendant published an article on its website entitled "Women on the Council, Next Speaker from Queens, Eric Adams' Inner Circle." JX5 (the "Article"); Tr. at 81:20–22. The Article, authored by Defendant's contractor Felipe De La Hoz, contained short biographies of certain public figures. JX5; Tr. at 80:16–17. One featured Commissioner Sewell. JX5. Some biographies were accompanied by a photo, and Commissioner Sewell's was paired with the at-issue Photo. *Id.*; Tr. at 50:7–52:10. Mr. De La Hoz did not select photos for the Article. Tr. at 89:9–90:2. Rather, that job belonged to his editor, another contractor named Danielle Hyams. *Id.* at 47:23–24, 81:4–11. Defendant lacked a license to use the Photo, although it did have licenses to use at least four of the five other photos in the Article. *Id.* at 50:7–52:10. Between the Article's publication in December 2021 and March 2023, when Defendant took the Photo down after Plaintiff sued, the Article received fewer than 100 views. *Id.* at 82:10–18, 82:22–23. In December 2021, Defendant's entire website received only dozens of page views each day. *Id.* at 33:24–34:3. At that point, Defendant received no advertising revenue from the website. *Id.* at 26:20–23. And Defendant generated no revenue from the Article or Photo. *Id.* at 81:12–15.

### III.    Defendant's Policies and Procedures for Copyright Compliance

Each photo in the Article contained a credit line beneath it. JX5. For the Photo, the Article credited "Descendants of Hope." *Id.*; Tr. at 80:1–3. Descendants of Hope is an Instagram account from which Ms. Hyams pulled the Photo for use in the Article. *Id.* at 80:1–3,

4

42:4–5.  At the time, Defendant believed that crediting the Photo in this way was sufficient to comply with the copyright laws.  *Id.* at 80:7–10.  The Photo contained no markings or watermarks indicating that it was copyrighted.  JX1; Tr. at 100:12–19.

At the time, this way of selecting photos was familiar to Defendant.  As of December 2021, Mr. Mukul and Ms. Hyams were primarily responsible for copyright compliance, and Ms. Kalita collaborated with them in the editorial process, which included copyright compliance.  Tr. at 38:17–39:9, 74:12–21; *see also id.* at 46:16–19.  Defendant, primarily through Ms. Hyams, selected photos from a variety of sources, including directly from writers, press releases, and official public agency or department websites.  *Id.* at 30:12–24; *see also id.* at 43:14–19, 46:2–8.  Defendant also used photos from the Creative Commons, which provides photographs for free use.  *Id.* at 31:11–15, 79:14–23.  In addition, Defendant also took and used photos from Instagram accounts.  *Id.* at 30:25–31:4.  Sometimes, those accounts belonged to government agencies or nonprofit organizations, and contained photos related to the programs that those organizations were running, such as a food pantry.  *Id.* at 31:16–32:6.  Occasionally, Defendant's author or editor would email the relevant organization for permission to reuse a photo posted to Instagram.  *Id.* at 31:5–10.  Ms. Kalita would also occasionally check the crediting of the photos in articles before they were published, and she sometimes personally emailed sources to ask for permission to use their photos, although she did not supervise the republication of the at-issue Photo.  *Id.* at 40:2–24, 43:3–4.  Defendant thought that sourcing photos in this way allowed it to make sure they were properly licensed.  *Id.* at 30:12–16, 32:16–21.  As of December 2021, it did not maintain formal training and compliance materials related to copyright.  *Id.* at 43:6–9.  Nor did it maintain records related to copyright licenses it obtained.  *Id.* at 44:23–45:2.

When the Article was published, Ms. Kalita, Mr. Mukul, Ms. Hyams, and Mr. De La Hoz each had experience in the publishing industry. *See* PX4 (KMC Biographies); Tr. at 35:19–36:19. Ms. Kalita has been involved in journalism since she was in high school. *Id.* at 16:19–25. Since 2000, she has held various positions at *Newsday*, *The Washington Post*, *Mint*, *The Wall Street Journal*, *The Atlantic*, the *Los Angeles Times*, and CNN. *Id.* at 17:23–23:21. In these different positions, her work sometimes involved photos, but she was never specifically involved in licensing them. *See generally id.* And only at CNN did she occasionally have direct copyright compliance responsibilities. *Id.* at 61:8–19. Although she has general familiarity with copyright, she is not formally educated on it. *Id.* at 17:14–18, 37:2–16. In these roles, she relied on departments with copyright specialists. *Id.* at 62:1–4. For example, as a managing editor at the *Los Angeles Times*, she coordinated with departments responsible for sourcing photos. *Id.* at 22:19–23.

Defendant cannot afford a standalone copyright compliance department. *Id.* at 76:2–7. Nevertheless, it has formalized its procedures as it has grown and the COVID situation stabilized. *Id.* at 77:18–22. After publication of the Article but before the initiation of this suit, Defendant began meeting with lawyers at the Cornell Law Center to engage in copyright training. *Id.* at 76:12–16. Together with the Cornell lawyers, Defendant developed a training manual and policies around copyright, which it rolled out in July 2022. *Id.* at 76:17–23. Defendant engages in annual training with Cornell, which includes copyright matters, and materials involving copyright are part of new employees' onboarding materials. *Id.*

## IV.    This Case

Ms. Kalita first learned of this suit in March 2023, after it had been filed. *Id.* at 81:23–24. She was surprised to learn of it because the Article was so old and she was unaware of any

issues with it.  *Id.* at 82:2–5.  Ms. Kalita learned of the suit only because defense lawyers were

reaching out to her to offer their services.  *Id.* at 82:5–9.  Plaintiff did not contact her before

suing, such as by sending a cease-and-desist letter.  *Id.* at 82:19–21.  When Defendant learned of

this suit, it removed the Photo.  *Id.* at 82:22–23.  Defendant has never otherwise been sued for

copyright infringement.  *Id.* at 75:24–76:1.

## CONCLUSIONS OF LAW

"The owner of a registered copyright that has been infringed can elect to recover either

actual damages or statutory damages."  *Nat'l Football League v. PrimeTime 24 Joint Venture*,

131 F. Supp. 2d 458, 471 (S.D.N.Y. 2001) ("*NFL*"); 17 U.S.C. § 504(c)(1).[4]  In this case,

Plaintiff seeks a statutory damages award.  ECF No. 46 at 12.  "The statute provides for an award

in an amount of 'not less than $750 or more than $30,000 as the court considers just,' for each

work where the plaintiff can demonstrate that the copyright has been infringed."  *Jeremiah v. 5*

*Towns Jewish Times, Inc.*, No. 22-cv-5942, 2024 WL 4163664, at *3 (E.D.N.Y. Sept. 12, 2024)

(quoting 17 U.S.C. § 504(c)(1)).  However, "[p]ursuant to Section 504(c)(2) of the Copyright

Act, an infringer's intent can affect the amount of statutory damages awarded:  only a minimal

award may be warranted where the infringement is innocent; a higher award may be warranted

where the infringer acted willfully."  *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 143 (2d

Cir. 2010).

Plaintiff alleges that Defendant acted willfully and seeks enhanced statutory damages on

that basis.  ECF No. 46 at 14.  "[W]hen the infringement is willful, enhanced statutory damages

ranging to as much as $150,000 may be awarded."  *Jeremiah*, 2024 WL 4163664, at *3 (citing

---

[4]      Unless otherwise indicated, when quoting cases, all internal quotation marks, alteration
marks, emphases, footnotes, and citations are omitted.

17 U.S.C. § 504(c)(2)).  "To prove willfulness . . . the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard for, or willful blindness to, the copyright holder's rights."  *Island Software & Comput. Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005).  In this case, Plaintiff does not claim that Defendant had actual awareness of its infringement but rather that Defendant acted with "reckless disregard" for his rights.  ECF No. 46 at 15–16.  On the other hand, Defendant argues that its infringement was innocent and that reduced statutory damages are appropriate.  ECF No. 51 at 13.  "[W]hen an 'infringer sustains the burden of proving . . . that [it] was not aware and had no reason to believe that [its conduct] constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200.'"  *Latin Am. Music Co. v. Spanish Broad. Sys., Inc.*, 232 F. Supp. 3d 384, 393 (S.D.N.Y. 2017) (internal brackets in original) (quoting 17 U.S.C. § 504(c)(2)).  To prevail on this claim, Defendant "must show (1) a subjective good faith belief in the innocence of its conduct that was (2) objectively reasonable under the circumstances."  *Id.*

## I.      Innocent Infringement

As an initial matter, Defendant has not carried its "heavy" burden to prove innocent infringement.  *NFL*, 131 F. Supp. 2d at 476.  The innocent infringement defense frequently applies "where the defendant (often unsophisticated) proves that it did not know about plaintiff's copyright and immediately ceased its infringing conduct upon being made aware of plaintiff's copyright claim."  *Id.* at 477.  To be sure, Defendant has demonstrated a subjective good faith belief in its innocence.  The Photo contained no notice that it was copyrighted.  *See D.C. Comics Inc. v. Mini Gift Shop*, 912 F.2d 29, 35 (2d Cir. 1990) (finding innocent infringement, *inter alia*, where "there were no copyright notices on the infringing goods").  Defendant credited

Descendants of Hope when it used the Photo, which is consistent with a belief that it was permitted to use the Photo—*i.e.*, that its conduct was innocent. And Defendant immediately removed the Photo when it was alerted to its infringement. That, too, is consistent with a good-faith belief that its use of the Photo for the prior 15 months was permissible. *See NFL*, 131 F. Supp. 2d at 477.

That being said, the evidence precludes the Court from finding that Defendant has satisfied the second prong of objective reasonableness. Based on the record evidence, the Court finds that "it was not objectively reasonable under the circumstances to believe that [the Photo] was free for any person on the internet to copy and repurpose." *Golden v. Michael Grecco Prods., Inc.*, 524 F. Supp. 3d 52, 67 (E.D.N.Y. 2021). Although this is admittedly a close call, the Court is persuaded by precedent. The facts of this case are similar to those in *Golden*, in which Judge Garaufis rejected an infringer's innocent infringement defense on the objective reasonableness prong after he asserted that he was "free to use" an image he found on Tumblr, another social media platform, without providing further evidence as to why such use would have been permissible. *Id.* The same is true here with respect to the Descendants of Hope account. In addition, this conclusion is bolstered by Defendant's relative sophistication. Many courts consider the infringer's sophistication in evaluating its state of mind. *See D.C. Comics*, 915 F.2d at 35–36. As discussed in greater detail below, KMC was undoubtedly in its infancy when it published the Article, but its staff had at least some relevant publishing experience, and Ms. Kalita had at least a generalized knowledge of the need to comply with copyright laws. Indeed, its sourcing of photos from, for example, public websites, and its occasional requests to sources for permission to use their photos, confirm that Defendant recognized the need to choose only photos it was permitted to use. Defendant might have had a better argument had it, for

9

example, taken a photo from the NYPD's own Instagram account. But Defendant has not put forward evidence showing why using the Photo posted on Descendants of Hope was objectively reasonable. Thus, it has failed to carry its burden on innocent infringement.

## II.    Willful Infringement

At the same time, Plaintiff has failed to carry his burden to show that Defendant acted willfully by recklessly disregarding his rights. *See Island Software*, 413 F.3d at 263. In inquiring into Defendant's state of mind, the Court may consider "whether the infringer was on notice that the copyrighted work was protected, whether the infringer had received warnings of the infringements, as well as whether the infringer had experience with previous copyright ownership, prior lawsuits regarding similar practices, or work in an industry where copyright is prevalent." *Hudson Furniture, Inc. v. Mizrahi*, No. 20-cv-04891, 2023 WL 6214908, at *17 (S.D.N.Y. Sept. 25, 2023). Fundamentally, a defendant acts with reckless disregard for a plaintiff's rights when it "knows of a substantial and unjustified risk of [its] wrongdoing." *Otto v. Hearst Commc'ns, Inc.*, No. 17-cv-04712, ECF No. 130 at 23:23–24 (S.D.N.Y. Aug. 5, 2019) ("*Hearst I*") (Woods, J., Oral Decision After Bench Trial).

In view of these factors and the entire record, Plaintiff has plainly failed to demonstrate recklessness. As Defendant correctly observes, Plaintiff has put forward no evidence demonstrating actual notice of Plaintiff's copyright, nor does he dispute that Defendant immediately removed the infringing Photo when it received such notice. *See* ECF No. 51 ¶ 30. Indeed, Plaintiff does not now raise any contrary arguments in support of his position; rather, he goes all in on just one factor: Defendant's sophistication. *See* ECF No. 46 at 14–17. Specifically, he asserts that "Defendant, as a sophisticated publisher, should have known that a license was required from the copyright holder to re-publish the [Photo] on the Website and,

prior to the act of infringement, Defendant made no attempt to analyze whether a license was required." ECF No. 46 at 15–16 & n.3.

The problem with Plaintiff's position is that it asks me to draw a generalized inference based mostly on speculation, not the evidence marshaled at trial. Notably, it is undisputed that Defendant credited Descendants of Hope and that it believed such accreditation, along with its more general process of sourcing photos from official websites and other public accounts, were sufficient to ensure copyright compliance. Despite having had the opportunity to do so, Plaintiff did not put forward evidence to undermine this belief, including by not calling Ms. Hyams, who actually selected the Photo. *See Hearst I* at 26:17–21. In fact, all he argues is that Ms. Hyams should have known better based on her "extensive experience," but all he puts forward in support of that view is an excerpt from her KMC biography, not discussed at trial, referencing her position and journalism education. ECF No. 46 at 8 ¶ 10, 18–19. That meager background evidence is far too little for the Court to make the leap that she recklessly disregarded or was willfully blind to the risk that Descendants of Hope impermissibly republished the Photo and that KMC could not reuse it. Accordingly, based on that undisputed evidence, "it is at least equally possible for me to draw the inference," contrary to Plaintiff's claim, that Ms. Hyams did in fact make a good-faith determination that the accreditation and sourcing would not infringe on a copyright of which she was indisputably unaware. *Hearst I* at 25:2–13. On these facts, Plaintiff has not carried his burden to prove willful conduct, as "[i]nfringement is generally not willful if a party reasonably and in good faith believes that its conduct is innocent." *Agence France Presse v. Morel*, 934 F. Supp. 2d 547, 570 (S.D.N.Y. 2013) (Nathan, J.), *reconsideration granted in irrelevant part*, 934 F. Supp. 2d 574 (S.D.N.Y. 2013).

The Court's conclusion is bolstered by the fact that Plaintiff overstates and misconstrues Defendant's sophistication during the relevant time period. Plaintiff asserts without elaboration that "Defendant is overseen by a 'veteran reporter' [Ms. Kalita] whom [sic], in turn, supervises other veterans of the news media and publishing world in the daily operations of Defendant's business." ECF No. 46 at 15. From that alone, Plaintiff would have the Court draw the inference that Defendant acted with reckless disregard for Plaintiff's copyright. There are two problems with that argument. First, the inquiry into Defendant's sophistication is not an all-or-nothing matter; rather, the Court considers Defendant's "level of sophistication" as part of the inquiry into "the attitude and conduct of the parties" as it relates to Defendant's *mens rea*. *See D.C. Comics*, 912 F.2d at 35–36. Even when an unquestionably sophisticated defendant commits copyright infringement, such infringement is not necessarily willful, as Plaintiff suggests. *See, e.g.*, *Hearst I* at 3:22–25, 4:25–5:1, 7:6–18, 26:7–13 (finding no willfulness where Hearst Communications, a "diversified media business . . . employ[ing] more than 1,000 people" and with a "significant presence in the publishing business," infringed by using a plaintiff's photo taken from a third party's Instagram account); *Bryant v. Europadisk, Ltd.*, No. 07-cv-3050, 2009 WL 1059777, at *8 (S.D.N.Y. Apr. 15, 2009) (finding no willfulness where the infringer's agent was entering a new business area and believed that he abided by the "spirit" of the relevant agreement even though that agent had 15 years of experience in the music industry and had copyrighted his own recordings), *aff'd sub nom. Bryant*, 603 F.3d at 143.

Second, the record again undermines Plaintiff's characterization of Defendant. To be sure, as discussed above, Defendant had some sophistication based on its employees' experience in the publishing industry. But at the time of the infringement, it remained a small enterprise with just four employees and generated no advertising revenue from its website. Quite unlike the

major organizations where Ms. Kalita had previously worked and could rely on others to ensure copyright compliance, *see* Tr. at 62:1–4, she now took on part of that responsibility within a growing organization in which it would have been "prohibitively expensive" to maintain a dedicated copyright compliance department, *id.* at 76:6–7.  Despite Plaintiff's pleas to Defendant's experience, he does not account for this uncontested evidence, and it further undermines his willfulness claim.  *See Philpot v. L.M. Commc'ns II of S.C., Inc.*, 343 F. Supp. 3d 694, 702 (E.D. Ky. 2018) ("*Philpot I*") (although the plaintiff "spent a significant amount of time at trial establishing [the defendant's owner]'s long history in the . . . industry and pointing to his lack of controls," finding no willfulness where, "at the time of the infringement [the defendant] had just launched its website, . . . only had 4 or 5 employees, and did not have a sophisticated IT department"), *rev'd and remanded on other grounds*, 776 F. App'x 906 (6th Cir. 2019).

Similarly unchallenged is the evidence that *despite* its size, Defendant took affirmative steps to comply with its copyright obligations.  *See* ECF No. 51 ¶ 32.  Such conduct is hardly consistent with a policy of, as Plaintiff suggests, willful avoidance of learning about Plaintiff's copyright.  *See* ECF No. 46 at 16.  And aside from in the instant case, the basic compliance system appeared to work effectively for an organization of this size.  Ms. Kalita credibly testified that at least four of the six photos in the Article were properly licensed,[5] and there have never been other copyright infringement suits against Defendant.

---

[5]    Plaintiff tried to impeach Ms. Kalita's testimony on this issue at trial by pointing to deposition testimony, in which she apparently confirmed that just one other photo has a license, and he also now argues that Ms. Kalita's claim lacks "documentary evidence."  ECF No. 46 at 16–17.  He also now posits that Ms. Kalita's process for confirming whether the other photos were licensed was insufficient.  *See id.* at 17.  But it is too little, too late for Plaintiff:  because he does not identify other evidence on this point, he fails to undermine Ms. Kalita's credible testimony.  Plaintiff also misconstrues that testimony.  Ms. Kalita did not testify that she thought the other photos were properly licensed merely because they were credited.  *See id.*  Rather, she

Plaintiff's scattershot of other critiques of Defendant's system of copyright compliance misses the mark.  First, he argues that "[n]o records of copyright licensing were available nor maintained at the time of the [i]nfringement."  ECF No. 46 at 16.  But he never links that to willfulness.  Indeed, that argument would not be sound because a party can have a license to use a photo even without a written record of it.  *See, e.g.*, *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998) ("Under federal law, nonexclusive licenses may be granted orally, or may even be implied from conduct.").

Second, he claims that when Ms. Kalita conducted a review of a piece, "it was primarily a review to determine the source from where any particular third-party content was acquired and ensuring a credit was provided."  ECF No. 46 at 16.  Plaintiff never explains why Ms. Kalita needed to personally check each photo for copyright compliance; indeed, he later asserts in the briefing on fees and costs that she "did not have a direct role in the [i]nfringement."  ECF No. 49 at 14.  Particularly in a growing organization like hers, it was reasonable for Ms. Kalita to rely on others to do that.  As in *Hearst I*, in which the defendant's supervisor relied on the infringing writer's "substantial experience in the publishing industry," 27:2–7, so, too, did Ms. Kalita reasonably rely on her experienced staff, with whom she discussed copyright matters, to source photos, Tr. at 46:11–19.  *See Hearst I* at 26:22–27:11 (supervisor's "decision to delegate determinations regarding . . . the potential need for a license . . . was not willfully blind or reckless" in view of, *inter alia*, that writer's experience and absence of prior issues with copyright compliance).  Plaintiff's argument is also misleading insofar as it suggests, without citation, that her review was insufficient "to determine, generally after the fact, whether it was

---

explained that Defendant undertook a broader compliance review process.  *See* Tr. at 51:12–14, 52:6–7.

permitted to utilize third-party content." ECF No. 46 at 16. To the contrary, Ms. Kalita credibly testified that she sometimes personally checked for licenses before publication, and that included also asking copyright owners for permission to use photos. Tr. at 40:23–24, 55:12–14. That system may have been flawed, but Plaintiff does not explain why those flaws rendered the conduct reckless. The law does not require perfection.

Third, Plaintiff claims that "Defendant failed to proffer an expert witness to establish [its] haphazard standard" for checking for copyright compliance. ECF No. 46 at 16. But it is not Defendant's burden to show a lack of willfulness. *See Bryant*, 603 F.3d at 143. Nor would such testimony necessarily have aided the Court in determining Defendant's *mens rea* at the time of infringement. *See Hearst I* at 29:19–23 ("[E]ven if Hearst's recordkeeping system could be structured in an arguably better way, that does not establish that they willfully infringed Plaintiff's copyright in this case. That position seeks to hold Hearst liable for conduct that is far closer to negligence than to willfulness.").

Ultimately, then, the Court agrees with Defendant that "[t]here is nothing in the record establishing that, under these facts, [it] acted in reckless disregard of [Plaintiff]'s property interests, or that [D]efendant clearly failed to follow industry norms for a company of this size." *Philpot I*, 343 F. Supp. 3d at 702; *see also Reed v. Ezelle Inv. Props. Inc.*, 353 F. Supp. 3d 1025, 1036 (D. Or. 2018) (finding no intentional or reckless conduct where the defendant's owner obtained infringing image from a "'free website' and believed the [i]mage was 'free'" and "'believed he took steps to make sure he was using a free image' by searching only for 'free' images"). The evidence makes clear that this is not a case in which Defendant took an overly "casual approach to copyright protection, with no real checks in place to ensure that copyrighted content was used only in an authorized manner." *Barcroft Media, Ltd. v. Coed Media Grp.,*

*LLC*, 297 F. Supp. 3d 339, 358–59 (S.D.N.Y. 2017) ("*Barcroft I*").  Its compliance system may have been imperfect and its conduct negligent, but Defendant did not act recklessly.

### III.    Award

For the reasons explained above, this is a case in which Plaintiff has not carried his burden to demonstrate willfulness and Defendant has not carried its burden to demonstrate innocence.  *Fitzgerald Publ'g Co. v. Baylor Publ'g Co.*, 807 F.2d 1110, 1115 (2d Cir. 1986).  Accordingly, the Court may award Plaintiff $750 to $30,000.  17 U.S.C. § 504(c)(1).  Within that range, the Court has "wide discretion" in selecting a specific award.  *Bryant*, 603 F.3d at 143.

"Awards of statutory damages serve two purposes—compensatory and punitive." *Fitzgerald*, 807 F.2d at 1117.  Against this backdrop, "[w]hen determining the amount of statutory damages to award for copyright infringement, courts consider:  (1) the infringer's state of mind; (2) the expenses saved, and profits earned, by the infringer; (3) the revenue lost by the copyright holder; (4) the deterrent effect on the infringer and third parties; (5) the infringer's cooperation in providing evidence concerning the value of the infringing material; and (6) the conduct and attitude of the parties."  *Bryant*, 603 F.3d at 144.

Plaintiff seeks a statutory damages award of $12,775.  ECF No. 46 at 19.  To reach that figure, he first argues that the estimated license fee for the Photo is $2,555, a number he obtained by using an online calculator from Getty Images.  *Id.* at 22; JX3 ("Plaintiff's Getty Estimate").[6] He then says that based on his assessment of the above *Bryant* factors, the Court should quintuple the estimated licensing fee, producing his final proposed award of $12,775.  ECF No. 46 at 25.  On the other hand, Defendant argues that if the Court does not find innocent

---

[6]    Plaintiff misidentifies the relevant exhibit as JX4 in his papers.  *See* ECF No. 46 at 22.

infringement, as here, an award at the bottom of the statutory range, $750, is appropriate, based on its analysis of the *Bryant* factors.  ECF No. 51 ¶¶ 37–38.  The Court proceeds to those factors.

### A.    Defendant's State of Mind

The first factor does not support a large statutory damages award.  Here, the Court incorporates its prior discussion of Defendant's *mens rea*.  As explained there, Defendant did not act willfully.  Furthermore, "[i]n cases where plaintiffs have received maximum or substantial statutory damages . . . there is *additional* evidence of willfulness and allegations of actual awareness on the part of the defendants of their infringing activity; there is usually at least one cease-and-desist letter sent to the defendant, and, frequently requests for injunctive relief." *Ramales v. Hadid*, No. 23-cv-7060, 2024 WL 4561770, at \*2 (S.D.N.Y. Oct. 23, 2024) (emphasis added).  No such additional evidence of willfulness exists in this case.  Rather, the Court agrees with Defendant that "[t]he evidence here is consistent with a mistake stemming from lack of sophistication."  ECF No. 51 ¶ 40 (emphasis omitted).

### B.    Expenses Saved and Profits Earned by the Infringer

The second factor also does not support a large award.  Plaintiff asserts that "Defendant has financially benefitted from its use of Plaintiff's work in that it assisted in the Article's appeal so as to increase user engagement by which Defendant is paid a flat fee for advertising done on the Website."  ECF No. 46 at 25.  He further claims that "after the Article was published on the Website it was further disseminated via electronic mail to several thousand additional persons in furtherance of Defendant's commercial activities."  *Id.*  The Court is not persuaded.  Defendant is right in its claim that Plaintiff has put forward no evidence that Defendant saved expenses or earned profits from the Photo.  ECF No. 51 ¶ 41.  In fact, Ms. Kalita credibly testified that Defendant earned no revenue from the Article, and even if many people were encouraged to read

17

the Article, almost no one did:  it received fewer than 100 views over its entire online life.  *See id.* ¶ 42.  The Court credits this record evidence over Plaintiff's loose conjecture about unquantified downstream benefits flowing to Defendant from its use of the Photo.

### C.    *Revenue Lost by the Copyright Holder*

Analysis of the third factor is more complicated.  Although Plaintiff does not discretely address each of the *Bryant* factors, his argument appears to be that the infringement cost him the value of the $2,555 licensing fee calculated with the Getty Images calculator.  *See generally Ramales*, 2024 WL 4561770, at *3 (assessing potential lost licensing fees under this factor).  Here, though, it is essential to underline that Plaintiff's Getty Estimate does *not* estimate the value of licensing the at-issue Photo.  *Compare* JX1, *with* JX3.  Rather, Plaintiff's Getty Estimate concerns an entirely different photo of Commissioner Sewell not even taken by Plaintiff.  Because both parties previously failed to make this key distinction clear,[7] the Court raised this issue *sua sponte* at trial.  *See* Tr. at 119:8–10 (THE COURT:  "Just so I'm clear, JX-3, that's not a photo of yours.  So that's not the at-issue photo."  [PLAINTIFF]:  "No, it's not.").

Perhaps recognizing this problem, Plaintiff now argues that Plaintiff's Getty Estimate "is for a similar image" as he compares the at-issue Photo with the one underlying his estimate.  *See* ECF No. 46 at 23.  But even if Plaintiff's Getty Estimate is a proxy, Plaintiff has not, using evidence, shown it to be a reliable one upon which the Court can fashion a damages award.  For one, Plaintiff's Getty Estimate incorporates certain specifications, such as use for "Advertorial"[8]

---

[7]    For example, Plaintiff initially moved *in limine* to preclude an estimated licensing fee generated by Defendant's use of the Getty Images calculator.  *See* ECF No. 38 at 11–12.  Defendant opposed.  *See* ECF No. 42 at 10–12.  But no one noted that Defendant's estimate was also not based on the Photo.  (For the avoidance of doubt, this detail had no effect on the Court's *in limine* ruling, which concerned the timeliness of disclosure.  *See* Mar. 25, 2024, Text Order.)

[8]    Although Plaintiff's counsel argued at trial that the "advertorial rate," a combination of "advertising" and "editorial," "applies when a photograph is used for purposes of advertising

purposes and a time limitation.  *See* JX3.  As Defendant rightly observes, "Plaintiff has not demonstrated why the parameters [he] selected in the Getty Images calculator match the facts of the case."  ECF No. 51 ¶ 54.  Indeed, Plaintiff now raises the same valid criticism of a competing Getty Images estimate presented by Defendant at trial.  *See* ECF No. 46 at 23–24.  Thus, even if Plaintiff's Getty Estimate had been based on the subject Photo, the Court would nevertheless agree with Judge Liman that "the submission of a screenshot of the Getty Images price calculator on its own is not sufficient to establish a reasonable value for a licensing fee absent evidence that the screenshot in the calculator is for a use comparable to the alleged infringing use."  *Proimos v. Madison Prop. Grp.*, No. 20-cv-4832, 2021 WL 4391238, at *2 (S.D.N.Y. Sept. 24, 2021).  Further, there is more reason to doubt the reliability of Plaintiff's Getty Estimate given that Plaintiff actually gave the at-issue Photo to Polaris, another platform where interested customers can obtain photo licenses.  *See* Tr. at 94:20–23, 96:18–21.  Therefore, although a current market estimate for licensing the Photo was easily accessible to Plaintiff, he chose not to present this superior evidence.  This further undermines Plaintiff's claim that "that the Getty Images price calculator provides an appropriate fair market value for the [Photo]."  *Proimos*, 2021 WL 4391238, at *2 (rejecting this method).  And it more generally calls into doubt his proposed award based on a licensing fee.  *See Seelie v. Original Media Grp. LLC*, No. 19-cv-5643, 2020 WL 136659, at *5 (E.D.N.Y. Jan. 13, 2020) (concluding that the plaintiff's "decision to withhold his actual licensing fee . . . . suggests to [the court] that his usual fee for a picture like this may be in the hundreds of dollars rather than the thousands").

---

within the context of an editorial article," Tr. at 7:21–25, Plaintiff put on no evidence to support that interpretation, nor why it would be an appropriate specification here.  In fact, on direct examination, Plaintiff said that he did not know what the term meant.  *Id.* at 96:12–15.

Plaintiff has presented no other evidence of lost revenue.  Accordingly, "[t]he Court finds that an award of statutory damages should reflect the lack of information as to Plaintiff's actual damages."  *Cawthon v. Qinbojing*, No. 22-cv-3015, 2024 WL 4667998, at *5 (S.D.N.Y. Oct. 15, 2024), *report and recommendation adopted*, 2024 WL 4665835 (S.D.N.Y. Nov. 4, 2024); *accord Seelie*, 2020 WL 136659, at *2 ("[B]y not disclosing the license fee, [Plaintiff] has limited my ability to analyze the relevant factors[,] . . . as those factors include consideration of revenue lost . . . .").  In addition, the Court agrees with Defendant that any benefit it may have obtained is undercut by the fact that Defendant's use of the Photo was collateral in nature as it was just one part of one political news story.  This is far from a case in which a vendor steals a copyrighted photo of an NFL star and resells it on t-shirts outside a stadium on game day.  *See Stokes v. MilkChocolateNYC LLC*, 681 F. Supp. 3d 226, 241–42 (S.D.N.Y. 2023) ("[T]he collateral use of the Photograph weighs against an overly aggressive award because there is a likelihood that Defendant could have obtained the same benefit by substituting a different background photograph in the public domain.").

### D.    Deterrent Effect on the Infringer and Third Parties

A large statutory damages award will not enhance deterrence with respect to Defendant (and Plaintiff makes no argument about deterring third parties).  Referencing no legal authority, Plaintiff argues that the Court should treat this factor with "heightened consideration" because "Defendant and its staff should absolutely know how to appropriately license third-party content."  ECF No. 46 at 25.  However, Defendant appears to meet that demand (made on no authority).  Despite having now existed for years, Defendant has been accused of copyright infringement just this one time.  Plaintiff further asserts that "Defendant's conduct was not reasonable as it failed to adhere to a basic framework for the treatment of copyrighted content."

20

*Id.*  As previously discussed, Defendant did not lack a "basic framework" for ensuring copyright compliance; on the contrary, its approach seemed to work.  Plaintiff adds that "even though it purportedly has augmented it [sic] practices, Ms. Kalita's testimony makes clear that it continues to operate with a knowingly flawed practice in assuming particular actors have permission to use third-party content and that simply crediting those actors, who may have also infringed on a rights-protected work, provided authorization to utilize same [sic]."  *Id.*  That is misleading and hyperbolic.  What testimony stands for the proposition that Defendant "continues to operate with a knowingly flawed process"?  Ms. Kalita specifically testified that she understands that she cannot "automatically" republish photos from Instagram.  *See* Tr. at 32:11–14.  Indeed, her testimony, in which she stated that the need to obtain a license is made on a case-by-case basis, *see id.* at 32:16–21, is a more accurate understanding of copyright law than Plaintiff's.  *See, e.g.*, *Shaw Fam. Archives Ltd. v. CMG Worldwide, Inc.*, No. 05-cv-3939, 2008 WL 4298548, at *3 (S.D.N.Y. Sept. 11, 2008) ("Of course . . . Plaintiffs cannot 'license' anyone to use photographs . . . that have fallen into the public domain.  Anyone can use a public domain photograph . . . without obtaining permission . . . .").

There are other reasons why this case makes for a poor deterrence vehicle.  As previously discussed, Defendant has no history of copyright infringement and immediately removed the Photo from its website after being sued.  *See Tabak v. Lifedaily, LLC*, No. 21-cv-04291, 2021 WL 5235203, at *5 (S.D.N.Y. Nov. 9, 2021) (in the case of a default judgment, declining to issue a "substantial damages award" where the plaintiff did not claim that the defendant was a "serial copyright infringer").  After the infringement but before being sued, Defendant was already working with the Cornell Law Center on developing a formalized training and compliance program, which specifically includes a copyright component.  Tr. at 76:12–23.  And

after being sued, it undertook an audit of its work to ensure that it had proper licenses.  *Id.* at

53:22–25.  Although the Court fully appreciates Plaintiff's arguments about the need to protect

his intellectual property, *see* ECF No. 46 at 24, insofar as a large statutory damages award would

seek to encourage precisely the kind of corrective behavior Defendant has already engaged in,

such an award is inappropriate in this case.  *See Tabak*, 2021 WL 5235203, at *5 (explaining that

a plaintiff's appeals to deterrence must specifically account for the defendant's conduct because

deterrence is a matter of "degree").  Having presided over the trial in this case, it is abundantly

clear to the Court that Defendant never intended to infringe on Plaintiff's copyright and does not

intend to do so in the future.  There is no future violative conduct to deter.

### E.    The Infringer's Cooperation in Providing Evidence

The fifth factor—Defendant's cooperation in providing evidence concerning the value of

the infringing material—does not cut in either direction.  Because this is a hotly contested case,

this factor is less relevant.  *See, e.g.*, *Tabak*, 2021 WL 5235203, at *5 (finding factor satisfied

when the defendant defaulted); *Broad. Music, Inc. v. Prana Hosp., Inc.*, 158 F. Supp. 3d 184,

198–99 (S.D.N.Y. 2016) (high statutory damages award supported in part by "defendants' failure

to respond to plaintiffs' requests for discovery or to seriously engage with th[e] case").

Nevertheless, Plaintiff does not address this factor.  Meanwhile, Defendant says it cooperated by

pointing to the Getty Images calculator, "which showed . . . the estimated value of a license to

use the [Photo]."  ECF No. 51 ¶ 47; *see also* DX13 ("Defendant's Getty Estimate").  That

cooperation is not worth much because Defendant's Getty Estimate used the same not-at-issue

photo as Plaintiff's Getty Estimate, as the Court observed at trial.  *See* Tr. at 118:10–12 (THE

COURT:  "It's the exact image from the Getty page as JX-3, is it not?"  [PLAINTIFF'S

COUNSEL]:  "Yes.").  But that is really beside the point here because there is no argument that

"Defendant tried to conceal [its] wrongdoing or otherwise mislead the Court about the extent of the infringement." *Cawthon*, 2024 WL 4667998, at *6. Accordingly, this factor is neutral.

### F. Conduct and Attitude of the Parties

Finally, the sixth factor does not favor a substantial award. As will be discussed in greater detail below, the Court credits Defendant's argument that it acted cooperatively throughout this litigation and reasonably sought to resolve it at relevant junctures. The Court weighs especially heavily the fact that Defendant immediately removed the infringing Photo upon having learned of it, that it made an offer of judgment in the amount of $2,500 in September 2023, *see* ECF No. 43, and that it later conceded liability so as to advance the termination of this action. On the other hand, Plaintiff's conduct with respect to enforcing his copyright can fairly be described as "lackadaisical." *Barcroft I*, 297 F. Supp. 3d at 358. Although Plaintiff could not recall exactly when he learned of the infringement via counsel, he waited nearly a year to sue. Tr. at 114:3–23. Nor did he make any other effort to notify Defendant of its infringement, such as by sending a cease-and-desist letter, rendering incredible his instant arguments about the seriousness with which he—and the Court—must take Defendant to task for violating his property rights. Finally, his failure to put forward information about the licensing fee for the Photo, despite it having been available to him, and his choice to have instead relied on a dubious proxy, unnecessarily confused the issues at trial and "has hindered the Court in its assessment of the basis for the requested statutory damages." *See Hirsch v. Sell It Social, LLC*, No. 20-cv-153, 2020 WL 5898816, at *4 (S.D.N.Y. Oct. 5, 2020) (concluding that the sixth factor "warrant[ed] a less substantial award" where the defendant withheld "his own licensing history").

G.    Conclusion

As the foregoing analysis makes clear, none of the *Bryant* factors nor any other reasons support a substantial statutory damages award.  First, the Court easily rejects Plaintiff's request for $12,775, which he calculated by quintupling Plaintiff's Getty Estimate.  As a general matter, it is true that because "statutory damages are designed not only to compensate injuries sustained but also to discourage wrongful conduct," "a statutory damage award should significantly exceed the amount of unpaid license fee."  *Realsongs, Universal Music Corp. v. 3A N. Park Ave. Rest. Corp.*, 749 F. Supp. 2d 81, 87 (E.D.N.Y. 2010).  However, for the reasons already explained, Plaintiff has provided the Court with neither an actual licensing fee, a reliable proxy, nor any other evidence of loss.  On this thin record, it would be inappropriate to turn such a speculative estimate into an award, let alone apply a five-times multiplier on top of it, particularly in a case involving non-willful conduct.  Notably, all of Plaintiff's authorities in support of his proposed multiplier involve circumstances easily distinguishable from this case.  *See* ECF No. 46 at 25.[9]  The Court will not award Plaintiff $2,555, much less $12,775, as an award in that range would provide Plaintiff with an impermissible "windfall recovery."  *Peer Int'l Corp. v. Luna Records, Inc.*, 887 F. Supp. 560, 569 (S.D.N.Y. 1995) (Sotomayor, J.); *see also Philpot v. Music Times LLC*, No. 16-cv-1277, 2017 WL 9538900, at *8 (S.D.N.Y. Mar. 29, 2017) ("[W]hile there need not be a direct correlation between statutory damages and actual damages, it has generally been

---

[9]    *See Reiffer v. NYC Luxury Limousine Ltd.*, No. 22-cv-2374, 2023 WL 4029400, at *9 (S.D.N.Y. June 15, 2023) (willful conduct where the defendant "intentionally altered the image when it posted the Work to its website to delete Plaintiff's name"); *Tetra Images, LLC v. Grahall Partners, LLC*, No. 19-cv-05250, 2021 WL 2809566, at *4 (S.D.N.Y. July 6, 2021) (willfulness following default); *Mango v. BuzzFeed, Inc.*, 356 F. Supp. 3d 368, 375 (S.D.N.Y. 2019) (appropriate hypothetical licensing fee estimate based on previously negotiated licenses and willful conduct).

held that the statutory award should bear some relation to actual damages suffered."), *report and recommendation adopted*, 2017 WL 1906902 (S.D.N.Y. May 9, 2017).

On facts like these, there is precedent to support an award at the very bottom of the statutory range.  In *Golden*, the court found that an infringer's unauthorized, commercial use of a photo taken from a social media platform was not innocent, but nevertheless awarded only $750. 524 F. Supp. 3d at 67.  Likewise, in another case, the court awarded $750 when the infringing party, *inter alia*, "conceded liability and offered plaintiffs a settlement probably in excess of the actual profits it received" and the defendant's business was "small" with only "limited revenue." *Arclightz & Films Pvt. Ltd. v. Video Palace Inc.*, 303 F. Supp. 2d 356, 363 (S.D.N.Y. 2003). The court found that minimum award to be sufficient even though the defendant's infringement was willful, as the defendant "openly rented and sold unauthorized copies of [the infringing work]."  *Id.* at 362.  Nevertheless, here, the Court is cognizant that the award should not be "divorced entirely from economic reality."  *EMI Ent. World, Inc. v. Karen Records, Inc.*, 603 F. Supp. 2d 759, 769–70 (S.D.N.Y. 2009), *as amended*, 681 F. Supp. 2d 470 (S.D.N.Y. 2010). Accordingly, the Court finds that an award of $940—representing double Plaintiff's daily rate at the time he took the Photo—to be appropriate in this case.  To the extent that $470 is a somewhat depressed value because of a preexisting business relationship between Plaintiff and the *Post*, doubling the daily rate will more than adequately compensate Plaintiff, and deter Defendant, in a case involving a single instance of non-willful infringement.  This is especially true here, since Plaintiff's daily rate suggests a much lower relevant licensing fee.  In another case, the plaintiff provided the court with "no evidence of his lost revenues . . . nor the licensing history of the photo at issue."  *Mordant v. Citinsider LLC*, No. 18-cv-9054, 2019 WL 3288391, at *1 (S.D.N.Y. July 22, 2019).  However, similar to this case, the plaintiff "received a daily rate from

the [*New York Daily News*] of between $300 and $350 for his work as a photographer—regardless of how many of his photos from any given day were published." *Id.* The court concluded that "[c]onsidering that daily rate as a proxy for the licensing fee of the photo supports the view that Plaintiff's loss of revenue is significantly below even the minimum end of a statutory damages award" and awarded $1,000. *Id.* at *1–2. Similarly, $940 in statutory damages is warranted here.

## INJUNCTIVE RELIEF

Plaintiff seeks a permanent injunction barring Defendant from "further infringement of Plaintiff's copyrighted material." ECF No. 46 at 25 (emphasis and capitalization omitted). Plaintiff argues that "[s]hould the Court find Defendant's [i]nfringement willful[,] . . . monetary damages standing alone are inadequate as there is nothing stopping Defendant from appropriating his copyrighted material from a third party who [sic] Defendant subsequently identifies as an 'official' source." *Id.* at 26. Of course, that is inaccurate. Even if no injunction compels Defendant to follow the law, "everyone is required to obey the law," including the Copyright Act, which "comes with its own penalties." *See SEC v. Tourre*, 4 F. Supp. 3d 579, 598 (S.D.N.Y. 2014). That being said, given that Plaintiff's request for relief is predicated on a finding of willful infringement which does not exist in this case, the motion appears to be moot.

However, to the extent that Plaintiff seeks a permanent injunction regardless of Defendant's willfulness, the Court nevertheless exercises its "equitable discretion" not to issue one. *Cawthon v. Yongchunhengyuanmaoyiyouxiangongsi*, No. 22-cv-5059, 2024 WL 4716232, at *12 (S.D.N.Y. Oct. 29, 2024). "Once success on the merits is established, a plaintiff seeking a permanent injunction must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that

injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* Assuming *arguendo* that the first, third, and fourth factors are all met, the Court would still decline to enter an injunction on this record due to the complete absence of evidence that "Defendant's transgressions *will continue* and that Plaintiff is likely *to continue* to suffer irreparable injury in the absence of an injunction." *Cf. id.* at *13 (emphasis added).

In this case, Defendant "has no history of copyright infringement," took steps to improve its copyright compliance even before learning of this case, and then "immediately ceased" using the Photo upon being notified. *See Boisson v. Banian Ltd.*, 280 F. Supp. 2d 10, 19 (E.D.N.Y. 2003). These facts all "weigh strongly against finding a substantial likelihood of future infringement." *See id.* (declining to award permanent injunction). Without any "probability or threat of continuing or additional infringements" by Defendant, equitable relief is unwarranted. *See Dolori Fabrics, Inc. v. Limited, Inc.*, 662 F. Supp. 1347, 1358 (S.D.N.Y. 1987) (declining to award permanent injunction where the defendants, variously, had no history of copyright infringement, there was no probability of future infringement, and the infringement ceased "immediately" after the infringer received notice).

## ATTORNEY'S FEES AND COSTS

In copyright cases, "the [C]ourt in its discretion may allow the recovery of full costs" and "may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. The Court "may not award attorney's fees as a matter of course; rather, [the] [C]ourt must make a more particularized, case-by-case assessment," and it may not treat either party differently. *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 202 (2016). Because the

decision to award fees and costs under Section 505 is a matter of the Court's "equitable discretion," the Supreme Court has instructed that district courts may consider several nonexclusive factors in exercising that discretion: (1) frivolousness of the losing party's claims and defenses, (2) motivation, (3) "objective unreasonableness (both in the factual and in the legal components of the case)" of the claims and defenses, and (4) compensation and deterrence. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 & n.19 (1994); *Bryant*, 603 F.3d at 144. Overall, the Court must ensure that an award of fees is consistent with "[t]he primary objective of the Copyright Act . . . to encourage the production of original literary, artistic, and musical expression for the good of the public." *Fogerty*, 510 U.S. at 524.

Plaintiff moves for an award of $119,620.00 in fees and $1,774.49 in costs, for a total of $121,394.49. *See* ECF No. 49 at 29; ECF No. 50 (Plaintiff's Fees Brief & Decl.); ECF Nos. 55, 56 (Plaintiff's Reply & Decl.). Defendant opposes that award. *See* ECF No. 53 (Defendant's Fees Brief); ECF No. 57 (Defendant's Sur-Reply). As indicated above and discussed in detail below, even though Plaintiff's counsel took a maximalist approach to this litigation, their efforts led to what can only be described as a suboptimal, and yet predictable, result. Plaintiff's current effort to conduct multiple mini-trials on the papers about virtually every aspect of this case is unavailing. In such a situation, no award of fees and costs is appropriate.

### A.    *Objective Unreasonableness*

The Court begins with this factor, which has "significant," but not dispositive, weight. *Kirtsaeng*, 579 U.S. at 209. "A lawsuit or litigation position is objectively reasonable if it has a reasonable basis in law and fact. Conversely, a lawsuit or litigation position is objectively unreasonable if it has no legal or factual support." *Boesen v. United Sports Publ'ns, Ltd.*, 2021 WL 1145730, at *2 (E.D.N.Y. Mar. 25, 2021), *aff'd*, No. 21-1029, 2022 WL 457281 (2d Cir.

Feb. 15, 2022). Plaintiff argues that Defendant acted with objective unreasonableness by raising four affirmative defenses but later abandoning them and conceding liability after Plaintiff sought leave to move for summary judgment on liability. *See* ECF No. 49 at 12. The Court disagrees that that concession rendered Defendant's conduct objectively unreasonable and agrees with Defendant that Plaintiff essentially asks the Court to adopt the view, rejected by district courts over and over, that an ultimate lack of success on the merits renders starting positions objectively unreasonable. *See, e.g.*, *Overseas Direct Imp. Co. v. Fam. Dollar Stores Inc.*, No. 10-cv-4919, 2013 WL 5988937, at *2 (S.D.N.Y. Nov. 12, 2013). Plaintiff would require Defendant to have raised only affirmative defenses it was certain could win, but that argument is somewhat ironic given that Plaintiff gave Defendant the minimal amount of time to try to do that. Recall that after learning of Defendant's infringement, Plaintiff took no action for nearly a year, and rather than attempting to resolve the issue short of litigation, Plaintiff's very first step was to sue.

The Court finds that Defendant's abandonment of its affirmative defenses actually cuts against Plaintiff. Because of Defendant's decision, Plaintiff never had to litigate the merits of any affirmative defense. As such, there is no evidence to support the argument that Defendant "continued to litigate after [the affirmative defenses] clearly became unreasonable." *Id.* at *2. Plaintiff hypothesizes that "had Plaintiff not moved for a pre-motion conference [on summary judgment], the parties would have proceeded to trial not only on the issue of damages but as to liability as well." ECF No. 49 at 12–13. And he later argues that "even if Defendant had attempted to challenge liability, such efforts would have certainly failed thereby undermining the objective reasonability [sic] of its position from inception." *Id.* at 13. But the only "certain[ty]" here is that no one, including the Court, knows how the affirmative defenses would have played out if actually tested. The standard is unreasonableness, not omniscience.

On this record, it was not objectively unreasonable for Defendant to raise several affirmative defenses and later concede to liability nevertheless, Plaintiff's conjecture notwithstanding. *See John Wiley & Sons, Inc. v. Kirtsaeng*, No. 08-cv-734, 2016 WL 7392210, at *3 (S.D.N.Y. Dec. 21, 2016) (concluding that even though a plaintiff withdrew one pleaded claim "early in the litigation and the other before trial," "[p]leading and litigating these claims for a period of time alongside [the initially meritorious claim] did not make [the plaintiff's] litigating position objectively unreasonable"); *see also Otto v. Hearst Commc'ns, Inc.*, No. 17-cv-04712, 2020 WL 377479, at *3 (S.D.N.Y. Jan. 23, 2020) ("*Hearst II*") ("To penalize [the defendant] for raising reasonable, even if unsuccessful, defenses against a claim that it correctly believed was substantially overvalued does not encourage 'defendants who seek to advance a variety of meritorious copyright defenses . . . to litigate' those defenses." (quoting *Fogerty*, 510 U.S. at 527)). Nor was it unreasonable for Defendant to argue that its conduct was innocent, ECF No. 49 at 14–15, a claim on which it nearly prevailed. Finally, it was not unreasonable for Defendant to have had an "interest and initial pursuit of the use of experts . . . as to the issue of damages," *id.* at 23, where, indeed, some additional analysis would have aided the Court. Remarkably, Plaintiff argues that Defendant's conduct on this front was unreasonable because "damages for a single photograph" are a "relative [sic] straightforward matter[]," ECF No. 55 at 10, and yet, as discussed above, Plaintiff's submission to the Court on this issue was overcomplicated and unreliable.

Plaintiff also claims that Defendant acted with objective unreasonableness because it "made no legitimate effort at settlement." ECF No. 49 at 19. Although the Court has already briefly touched on this issue, because the parties take such sharply opposing views of it, the Court now provides greater detail about the most relevant parts of the parties' negotiation history

as necessary for the analysis of this factor.  At the outset of this case, in March 2023, Defendant

offered Plaintiff $500 to settle.  ECF No. 41-1 at 2–3.  In a September 2023 settlement

conference, then-Magistrate Judge Reyes repeatedly suggested a settlement value of $2,500,

below Plaintiff's requested amount of $11,000, and shortly thereafter, Defendant made an offer

of judgment in the amount of $2,500.  ECF No. 28 at 5:21–23, 9:5–6, 12:21–23, 13:20–21.  In

March 2024, Plaintiff filed a pre-motion letter in anticipation of a motion to enforce a

"settlement" pegging statutory damages at $2,000, *see* ECF No. 40 at 1–2, which Defendant

opposed, *see* ECF No. 41, in part because Plaintiff, unbeknownst to the Court, also demanded

$73,660 in fees and $939.50 in costs, *see* ECF No. 41-4.  The Court denied the motion,

concluding that it was "clear" that the parties had "no meeting of the minds on all essential

terms."  *See* Mar. 25, 2024, Text Order.[10]  As this case approached trial, the Court *sua sponte*

entered an order, which stated in relevant part:

> In view of the *de minimis* amount in controversy and the parties' representations
> regarding their settlement efforts to date, the Court is concerned that Plaintiff may
> not be aware that he may ultimately be liable for certain costs, which are likely to
> increase significantly as this case approaches trial, pursuant to Rule 68(d).
> Accordingly, Plaintiff's counsel is ORDERED to file a declaration on the docket
> on or before April 2, 2024, confirming that they have conveyed <u>all</u> of Defendant's
> settlement offers and Defendant's offer of judgment, *see* ECF No. [41-3], to
> Plaintiff, and that Plaintiff is aware of the potential liability for Defendant's costs
> under these circumstances.

Plaintiff timely confirmed compliance with that Order.  *See* ECF No. 43.

In view of the foregoing, Plaintiff contends that Defendant has taken a "cavalier and

dismissive approach to this case."  ECF No. 49 at 19.  Not even close.  "[T]he failure to tender a

---

[10]    Plaintiff argues that the issue here is that Defendant "refus[ed] to honor" the parties'
agreement, forcing a trial.  ECF No. 55 at 9.  But Plaintiff may not treat as up for grabs issues
already squarely decided by the Court—*i.e.*, that "there [was] no enforceable settlement
agreement."  *See* Mar. 13, 2024, Text Order.

sufficiently high settlement offer in Plaintiff[']s view does not even remotely approach the kind

of misbehavior that would be required to justify an award of fees." *Barcroft Media, Ltd. v. Coed

Media Grp., LLC*, No. 16-cv-7634, 2018 WL 357298, at *2 (S.D.N.Y. Jan. 10, 2018) ("*Barcroft

II*") (denying award of fees and costs). Plaintiff's claims of Defendant's unreasonable failure to

settle hinge on the Court accepting the argument that it was so clear so early on that Plaintiff

would eventually obtain a statutory damages award degrees of magnitude larger than what he

ultimately was able to recover. Such clarity never existed. *See* Conclusions of Law. That

notwithstanding, Defendant still made an offer of judgment months before trial in an amount,

suggested by Judge Reyes, 2.6 times greater than what Plaintiff ultimately recovered. In this

sense, this case is very similar to *Bryant*, in which the Second Circuit affirmed the denial of

attorney's fees where "Appellees . . . were reasonable in trying to resolve the case short of trial:

Appellees made an Offer of Judgment in the amount of $3000, which Appellants rejected, in

favor of continuing to demand over $1 million in damages, notwithstanding the evidence that

Appellees had received less than $600 in revenues from infringing sales." 603 F.3d at 144.

At bottom, none of this is evidence of unreasonable conduct by Defendant. If anything,

the record points to unreasonable conduct by Plaintiff. *See Hearst II*, 2020 WL 377479, at *3

(declining to award fees and costs where the plaintiff "and his counsel consistently and

undeniably asserted inflated values for [the plaintiff]'s copyright" with "figures [that] were

wholly unsupported by the evidentiary record").[11] As Judge Reyes put it, "[t]his [became] all

---

[11]    Settlement aside, the Court credits Defendant's argument that Plaintiff's other conduct in
preparing for trial was unreasonable. For example, Plaintiff bizarrely criticizes Defendant for
wanting to move too quickly in the preparation of a joint pre-trial order. *See* ECF No. 49 at 21–
22. But this looks like nothing more than foot dragging by Plaintiff in the hopes of holding out
for a settlement. For example, Plaintiff refused to participate in a meet and confer about trial
preparation, *see* ECF No. 53 at 14, and the Court does not buy his counsel's implausible
explanation that this was meant to minimize costs as it "would be the subject of a fee

about attorney[']s fees." ECF No. 28 at 12:17. That led to Plaintiff's demands being so "outsized" that Defendant was "left . . . with no choice but to continue the litigation." *Hearst II*, 2020 WL 377479, at *4.[12] And to the extent that Plaintiff takes issue with defense counsel's characterization of this case as "ridiculous" during a settlement conference, ECF No. 49 at 19 (citation omitted), that comment was made in the context of an argument about the size of Plaintiff's demand juxtaposed against the facts of this case, *see* ECF No. 28 at 13:1–15. Judge Reyes agreed that Plaintiff's demand was way too large. *See id.* at 13:20–21. And so did I both back then, *see* Mar. 29, 2024, Text Order, and now.

**B.    Frivolousness**

The defenses in this action were not frivolous, or "lack[ing] an arguable basis either in law or in fact." *Boesen*, 2021 WL 1145730, at *3. Although Plaintiff does not clearly address each factor, his argument on this front appears to be that various affirmative defenses initially raised by Defendant, including statute of limitations, waiver, and laches, were all frivolous. ECF No. 49 at 16–18. The Court disagrees. "The test for frivolousness largely duplicates that of objective unreasonableness." *Boesen*, 2021 WL 1145730, at *3. Although Plaintiff attempts to fully relitigate the potential applicability of each of these affirmative defenses, the Court need not engage in further analysis because it has already determined that it was not objectively unreasonable for Defendant to initially raise these defenses. *See id.*

---

application," *see* ECF No. 55 at 10. Counsel clearly does not shy away from asking for a large award of fees and costs.

[12]    Plaintiff repeatedly cites to *Reiffer*. *See, e.g.*, ECF No. 49 at 19; ECF No. 55 at 5. That is a very good case for his desired outcome, but unfortunately for Plaintiff, it is nothing like this case. There, the losing party, *inter alia*, engaged in willful infringement, did not concede liability until summary judgment was briefed, wrongly asserted to the court that it conceded liability in its answer, and did not comply with basic discovery obligations. *Reiffer*, 2023 WL 4029400, at *12–13.

### C.    Motivation

Plaintiff has consistently asserted that defense counsel had an improper motivation in seeing this case through to trial.[13]  In his opening statement at trial, Plaintiff's counsel argued that:  "The evidence will show that defense counsel has provided representation pro bono as part of the law firm's pro bono program, which requires lawyers to meet a minimum hourly requirement for pro bono hours.  So this entire case is, for them, a glorified CLE [continuing legal education] credit, who drove this case, so its defense counsel ultimately who drove this case to trial."  Tr. at 9:5–10.  Plaintiff raises the same argument now, claiming that "Defendant's counsel have unreasonably conducted themselves and multiplied the proceedings the issues [sic] before the Court at every junction possible, [sic] for the purpose of inflating their pro bono billing hours."  ECF No. 49 at 22; *see also* ECF No. 55 at 11–12.  The Court agrees with Defendant that that argument is an "unsupported conspiracy theory."  ECF No. 53 at 22.  For one, it clashes with the record evidence.  Here, there is nothing at all to suggest that defense counsel sought to unnecessarily prolong this litigation.  Indeed, Defendant's conduct in, for example, making an offer of judgment exactly consistent with Judge Reyes's suggestion, is entirely incompatible with such an assertion.  It also makes no sense.  Why would defense counsel have instructed their client to concede liability if they secretly wanted a bigger trial?

At a deeper level, Plaintiff's argument is unconvincing and unprofessional.  *Pro bono* counsel have an important role to play in civil litigation.  It is undignified for Plaintiff's counsel

---

[13]    As it concerns Defendant itself, Plaintiff suggests that it lacks "skin in the game" and therefore unnecessarily prolonged this case because "any amount the [C]ourt may award will be covered by Defendant's insurance."  ECF No. 49 at 22–23.  Although this is not an important issue, Plaintiff once again breathlessly makes that argument, even though the only evidence in the record on this point is Ms. Kalita's credible testimony that insurance would not cover the claim in this case.  Tr. at 83:8–13.

to denigrate those efforts, especially without evidence.  Further, Plaintiff's argument suggests that defense counsel put its own interests before its client's.  Plaintiff's counsel should think long and hard before making such serious accusations in the future.  That is especially true on a record like this one, which evidences a vigorous and diligent defense of this action.  This factor does not support a fee award.

### D. Compensation and Deterrence

Plaintiff argues that awarding attorney's fees would serve the aim of compensation.  *See* ECF No. 49 at 24–25.  Plaintiff's basic argument is that "an award of attorney[']s fees to Plaintiff as the prevailing party would encourage copyright holders to bring meritorious claims which help demarcate the boundaries of copyright law."  *Id.* at 25 (quotation omitted).[14] Plaintiff's argument "proves too much" because "if accepted, that argument would call for fees and costs in any copyright infringement case in which the plaintiff prevailed."  *Barcroft II*, 2018 WL 357298, at *3.  Plaintiff "offer[s] no reasons *specific to this case* that a fee award would serve the purposes of the Copyright Act."  *Id.* (emphasis in original).  Indeed, like in *Barcroft II*, an award of fees would advance the purposes of the Act only "minimally" because the infringement in this case arose out of the collateral use of a single photo in a news story, "unlike fictional or transformational works that represent the 'core' of the Copyright Act's protections." *Id.*

---

[14]    Plaintiff repeatedly argues that he is "presumptively" entitled to fees and costs given the low value of the claim at hand.  ECF No. 49 at 9.  The Court considers the value of the claim as part of its broader analysis, "[b]ut *Fogerty* and *Kirtsaeng* are clear that district courts must make particularized, case-by-case assessments of attorney's fees—a mandate that is at odds with a 'presumptive entitlement' to fees in certain types of cases."  *Hearst II*, 2020 WL 377479, at *3. It is curious that Plaintiff's counsel does not acknowledge the apparent conflict between his current position and binding Supreme Court precedent given that he also represented the plaintiff in *Hearst II*.

Nor are any arguments on deterrence persuasive. Plaintiff argues that "should the Court award the minimum in statutory damages and, if the Court were to deny attorney[']s fees to Plaintiff after prosecuting this matter to trial, then [Defendant] (and others similarly situated) would be emboldened—if not encouraged—to steal more photographs, knowing that the penalty for doing so is nominal." ECF No. 49 at 12.[15] But that argument, similarly, applies in every infringement action. *See Hearst II*, 2020 WL 377479, at *4 ("[The plaintiff] has not provided the Court with any basis to conclude that [the defendant] in particular is in need of deterrence."). And it is at odds with the facts of this case. As the Court has now repeatedly concluded, there is very little, if any deterrence value, in "heaping additional costs on [Defendant] . . . to encourage its future compliance with the copyright laws." *Id.* The statutory damages award, in addition to the burden incurred by Defendant in going through this litigation, are more than adequate to deter future copyright violations. *See id.* ("[The] defense of this litigation was not costless . . . ."); *Golden*, 524 F. Supp. 3d at 67 (concluding that "[b]ecause [the defendant] has acted in good faith, immediately removed the offending post upon notice, and likely caused little or no actual damages, a statutory damages award . . . is more than sufficient to advance the purposes of the Copyright Act" and declining to award fees).

     E.    *Conclusion*

There is little weighing left to be done because all of the *Fogerty* factors cut against a fee award. In view of that lopsided scale and the record as a whole, the Court declines to exercise its discretion to award attorney's fees and costs pursuant to Section 505.

---

[15]    Plaintiff makes several other arguments ostensibly under the rubric of deterrence, but those arguments are largely irrelevant and seek to retread yet more issues from various points in this case, such as discovery disputes. *See* ECF No. 49 at 26–27. Plaintiff's argument that Defendant should not have filed confidential settlement communications on the docket in opposing Plaintiff's motion *to enforce settlement* is particularly mystifying.

## **CONCLUSION**

For the reasons discussed herein, Plaintiff is awarded $940 in statutory damages, plus post-judgment interest at the rate set forth in 28 U.S.C. § 1961, calculated from the date on which the Clerk of Court enters final judgment until the date of payment.[16]  Plaintiff's motion for attorney's fees and costs is denied.  The Clerk of Court is respectfully directed to enter judgment and to close this case.

SO ORDERED.

*/s/ Hector Gonzalez*
HECTOR GONZALEZ
United States District Judge

Dated:  Brooklyn, New York
November 15, 2024

---

[16]     Although Plaintiff does not specifically request post-judgment interest in his proposed conclusions of law, the Second Circuit has made clear that "the award of post-judgment interest is mandatory on awards in civil cases."  *See Tru-Art Sign Co. v. Loc. 137 Sheet Metal Workers Int'l Ass'n*, 852 F.3d 217, 223 (2d Cir. 2017); *Hirsch v. F. Daily Inc.*, No. 18-cv-6531, 2021 WL 1158562, at *10 (E.D.N.Y. Feb. 9, 2021) (applying Section 1961 in a copyright case), *report and recommendation adopted*, 2021 WL 1163153 (E.D.N.Y. Mar. 26, 2021).